Filed 10/25/21  P. v. Wallace CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GREGORY MARSHALL WALLACE,<br><br>    Defendant and Appellant. | 2d Crim. No. B305348<br>(Super. Ct. No. 1362689)<br>(Santa Barbara County) |

Gregory Marshall Wallace appeals from a postjudgment order denying his petition for resentencing under Penal Code[1] section 1170.95.  Wallace contends the court erred in summarily denying his petition without appointing counsel and providing counsel the opportunity to file a reply brief in response to the prosecution's opposition to the petition.  We agree that the court erred in failing to appoint counsel (*People v. Lewis* (2021) 11

_____

[1] All statutory references are to the Penal Code unless otherwise noted.

Cal.5th 952 (*Lewis*)), but conclude the error was harmless because the record of Wallace's conviction demonstrates he is ineligible for relief under section 1170.95 as a matter of law. Accordingly, we affirm.

### FACTUAL AND PROCEDURAL HISTORY[2]

In January 2010,[3] appellants [Wallace, Roberto Castaneda, and Christopher Jaime] were members of Lompoc's Westside VLP (VLP), a Sureño gang with allegiance to the Mexican Mafia. VLP paid a portion of its revenue as a "tax" to the Mexican Mafia. If the tax was not paid, the Mexican Mafia would target VLP members for assault or death.

Wallace was a high-ranking VLP member authorized to collect "taxes" for the gang. On January 10, Wallace was released from prison and began staying at his girlfriend Sonia Silva's apartment in Lompoc. He met that same day with VLP member Joshua Lemen and VLP associates Danny Sanchez and Phillip Hurt. Wallace said he wanted to "tax" non-gang members who were selling drugs in VLP's territory. Lemen and Sanchez gave Wallace the names of six local drug dealers and told some of the dealers they had to pay a tax to VLP.

On January 14, Wallace asked Lemen and Sanchez to identify "younger homeys out there that were putting in a lot of work" for VLP. Wallace met with Lemen, Sanchez, Castaneda, Jaime, and VLP members Sergio Melgoza, Osvaldo Monroy, Ray

---

[2] The relevant facts are recited verbatim from our 2018 opinion affirming the judgment against Wallace. (*People v. Castaneda* (July 26, 2018, B249571) [nonpub. opn.].)

[3] All unspecified date references are to the year 2010.

Cardoza, and Francisco Vargas.[4] Wallace said Lemen and Sanchez would sell drugs and that the others would act as a "gunning crew" and "really push up on the people [who] were selling drugs and force them to pay taxes."

Isidro "Pollo" Madera was a methamphetamine dealer who lived in Lompoc with his girlfriend Chastity Turner and her daughter. Madera often sold drugs in the alley near Wallace and Silva's apartment. During the week prior to Madera's murder on January 20, Castaneda and Cardoza went to his apartment several times seeking payment of the "tax." Madera either refused to pay or had Turner or her daughter say he was not home.

Juan Carlos Astorga lived in an apartment across the alley from Wallace and Silva. Astorga had allowed Madera to sell drugs out of his apartment. A week or so before Madera's murder, Wallace went to Astorga's apartment and demanded that he pay a monthly $100 tax to VLP. Wallace said things would "go really bad" for Astorga and Madera if they did not pay the tax. Wallace said he would try to collect from Madera again and left. Astorga called the police and reported the incident to Detective David Garcia.

On January 18, Wallace met at Silva's apartment with Castaneda, Jaime, Melgoza, Osvaldo Monroy, Lemen, and

---

[4] Cardoza and Vargas testified for the prosecution pursuant to plea agreements. Cardoza pled guilty to first degree murder and admitted gang and firearm use enhancements in exchange for a commitment to the Department of Juvenile Justice (DJJ) until the age of 23 or 25. Vargas pled guilty to second degree murder and admitted a gang enhancement for a sentence of 15 years to life.

Sanchez.  Wallace was angry and said he wanted them to kill a drug dealer who was refusing to pay taxes.  He received two shotguns from Lemen and gave them to Jaime along with a sheet of paper with Madera's address.

The day of Madera's murder, Wallace went to Astorga's apartment and again accused him of selling drugs there.  Wallace directed Carlos Correa, who was visiting Astorga, to drive Astorga and Jaime to Madera's apartment.  When Astorga and Correa returned, Wallace ordered them to walk with him to his apartment.  Castaneda, Jaime, Vargas, Cardoza, and VLP members David Yang and Eric Monroy[5] eventually arrived.  Wallace donned a black mask and gloves and told the group to "go over there and finish him off."  Wallace said, "This fool thinks I'm playing, if he doesn't pay up, blast him."

Castaneda, Jaime, Cardoza, Monroy, Vargas, and Yang got into Vargas's car.  Castaneda had a shotgun and Monroy had a shorter shotgun with black electrical tape on the handle.  The guns were given to Jaime, who wrapped them in a towel and placed them in the truck.  Vargas drove to an alley a block away from Madera's apartment and parked.  Wallace, Astorga, and Correa returned to Astorga's apartment.

Cardoza and Yang got out of Vargas's car and went to see if Madera was home.  They returned and reported that Madera was in the alley outside his apartment.  Jaime called Wallace, who

---

[5] Yang testified for the prosecution.  He was 15 years old at the time of the murder.  He pled guilty to second degree murder and admitted a gang enhancement in exchange for a DJJ commitment until the age of 23 or 25.  Eric Monroy (Monroy), Osvaldo Monroy's brother, disappeared several months after the murder and was still at large at the time of trial.

4

told him they should "blast" Madera if he refused "to pay up." Castaneda and Monroy took their shotguns from the trunk and the group walked toward Madera's apartment. Madera was in the carport fixing a flat tire on his truck. Jaime made a gesture to identify Madera to the others.

Castaneda and Monroy approached Madera. One of them asked Madera in Spanish if he was "Pollo" and Madera replied in Spanish, "Yes, why[?]" Jaime, Cardoza, or Yang said, "Get him." Castaneda and Monroy pulled out their guns and pointed them at Madera. Madera raised his hands and said, "No, no." Castaneda and Monroy fired their guns at Madera. A shotgun blast from Monroy's gun hit Madera in the back and he fell to the ground. Castaneda's gun jammed. Castaneda, Monroy, and Vargas ran back to Vargas's car. Jaime, Cardoza and Yang ran in the opposite direction.

Turner witnessed the shooting as she was returning to the carport from her apartment. The police arrived in response to a 911 call and found Madera lying on the ground and bleeding. He was transported to the hospital and later died from his injuries. Turner told the police that Cardoza and other VLP members had shot Madera.

Wallace heard the sirens from Astorga's apartment and told Astorga and Correa, "It's done." Wallace left and returned with a scale and methamphetamine, which he placed in several small packages.

Police officers responding to the incident saw Cardoza running nearby and detained him. Yang saw the police detain Cardoza, so he stayed in a restaurant before walking home. Vargas drove to the residence of his friend Alfonso Reyes, who lived across the street from Astorga. Monroy told Reyes that

Monroy and Castaneda "just did something" and needed to destroy the evidence. Castaneda and Monroy gave their clothes to Reyes and took showers. Reyes burned the clothing and gave Castaneda and Monroy other clothes to wear.

Monroy removed the guns from Vargas's car. Vargas removed the towel along with a carrying bag for a chair. Monroy wrapped the guns and bag in the towel and put them in an apartment behind Reyes's house. On Wallace's orders, Jamie put the guns in the bag and brought them to Astorga's apartment. Wallace hid the guns in the backyard. Jaime took the packages of drugs Wallace had assembled and left.

While Wallace was still at Astorga's apartment, Detective Garcia called Astorga and told him Madera had been killed. Astorga said he told the detective he was okay but did not elaborate because Wallace was there. After Astorga hung up, Wallace told him he would be using his apartment to sell drugs and hid some of the drugs in the backyard. Wallace said Astorga would suffer the same fate as Madera if he did not take care of the drugs and guns. After Wallace left, Astorga called Detective Garcia and reported what had happened. The detective and another officer went to Astorga's apartment and Astorga showed them where the guns and drugs were hidden. Astorga and his son were escorted to the police station.

Wallace was arrested several hours later at his apartment. When he spoke to Silva by telephone a few hours after his arrest, he said the "old dude" across the street still had his "stuff" and that his "protégé" Jaime knew this "because he was over there with [him]." Wallace had similar conversations with Jaime and Silva. The next day, Wallace called Silva and told her to convey to Jaime that the police were asking questions and to tell

everyone to keep quiet. Several days later, Silva told Jaime, Vargas, and Melgoza that Wallace wanted them to recover the guns from Astorga's apartment. Jaime, Vargas, and Melgoza ransacked the apartment in an effort to find the guns, not knowing that the police had already confiscated them.

Lompoc Police Department Agent Scott Casey testified as the prosecution's gang expert. Agent Casey testified about VLP's pattern of criminal activity and identified the predicate crimes committed by its members. Based on his review of the reports in the case and the trial testimony, Agent Casey opined that VLP would benefit from killing a drug dealer who refused to pay taxes to the gang. When presented with a hypothetical tracking the facts of the case, the agent opined that Madera's murder was committed for VLP's benefit.

Jaime did not present any evidence in his defense. Castaneda offered the testimony of a private investigator who interviewed Turner four times. Turner told the investigator that the individuals who shot Madera were two older men. She also said the men were bigger than the two teenagers (one of whom was Castaneda) who came to the apartment looking for Madera.

Wallace offered several witnesses who testified to Astorga's reputation for dishonesty and untrustworthiness. Astorga's stepdaughter testified that he had molested her as a child. Wallace also called a gang expert who opined it was doubtful that a VLP member who had just gotten out of prison would be given the power to make gang-related decisions. The expert also expressed doubt that someone with a leadership position in the gang would plan a murder while non-gang members were present. He further questioned whether a gang would sanction

the killing of a "nickel and dime drug runner" and give him so little time to pay before carrying out the crime.

In 2013, a jury convicted Wallace, Castaneda, and Jaime of first degree murder (§§ 187, subd. (a), 189). The jury also found several enhancement allegations to be true, including that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that Wallace committed the murder for financial gain and to further the activities of his gang (§ 190.2, subds. (a)(1), (a)(22)). Wallace was sentenced to life without the possibility of parole (LWOP) plus 25 years to life and nine years eight months. The judgment against him was subsequently affirmed on appeal. (*People v. Castaneda*, *supra*, B249571.)

In December 2019, Wallace filed a petition for resentencing under section 1170.95 and requested the appointment of counsel. The petition alleged among other things that Wallace was convicted of first degree murder "pursuant to the felony murder rule or the natural and probable consequences doctrine" and that he "could not now be convicted" of that crime because he was not the actual killer and "did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree." Wallace also attached a declaration from Monroy, who is currently serving a prison sentence on an unrelated matter, stating among other things that Wallace had merely directed him, Castaneda, Jaime, and Vargas to assault and rob Madera.

On February 14, 2020, the People filed motion to dismiss the petition and attached a copy of the unpublished opinion affirming the judgment against Wallace. As the People noted, our opinion recognized that under the instructions given to the jury Wallace could only have been found guilty of first degree

8

murder as a direct aider and abettor. The People further noted that in finding the financial gain and gang special circumstance allegations to be true (§ 190.2, subds. (a)(1), (a)(22)), the jury necessarily found that Wallace acted with an intent to kill.

On March 6, 2020, the trial court denied the petition without appointing counsel or giving appellant the opportunity to file a reply brief. In reaching its conclusion, the court took judicial notice of the trial and appellate court records in the case pursuant to Evidence Code section 452, subdivision (b). The court reasoned: "While [Wallace] was convicted of first degree murder (without being the actual killer), the Court of Appeal on direct appeal rejected any claim that [Wallace's] first degree murder conviction violated *People v. Chiu* (2014) 59 Cal.4th 155, superseded by statute as stated in *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1103, by noting the jury instructions indicated [Wallace] (and his codefendants) could be found guilty 'of first degree murder only if they intended to kill [the victim] and acted with premeditation. The jury thus convicted them [i.e., including petitioner Wallace] under direct aiding and abetting principles . . . .' The appellate court reinforced the point by observing the jury found [Wallace] murdered for financial gain. The financial gain special circumstance[] applies to murders that 'are intentional and carried out for financial gain.' (§ 190.2, subd. (a)(1).) The appellate court's conclusions on direct appeal—i.e., the jury unmistakably determined in light of 'overwhelming' evidence and pursuant to instructions actually given that [Wallace] acted with malice, premeditation, and deliberation when committing first degree murder as a direct aider and abettor— render him ineligible for relief under section 1170.95." (Italics omitted.)

9

## DISCUSSION

Appellant contends the trial court's denial of his petition for resentencing without appointing counsel or affording him the opportunity to file a reply brief violated his rights to the assistance of counsel and a fair hearing under section 1170.95 and the federal and state constitutions. We conclude the court erred in failing to appoint counsel or provide an opportunity for counsel to file a reply brief, but deem the error harmless.

In 2018, the Legislature amended the felony murder and the natural and probable consequences doctrines to ensure that "murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f), p. 6678; *People v. Gentile* (2020) 10 Cal.5th 830, 842.) The Legislature then amended sections 188 and 189, and added section 1170.95, to provide a procedure to persons previously convicted of murder pursuant to the felony murder or natural and probable consequences theories to obtain retroactive relief. (*Gentile*, at p. 853 ["the Legislature intended section 1170.95 to be the exclusive avenue for retroactive relief under Senate Bill [No.] 1437"].) To be eligible for resentencing, a defendant must establish that he "could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective" as part of Senate Bill No. 1437. (§ 1170.95, subd. (a)(3).)

Subdivision (a) of section 1170.95 sets forth the requirements for a facially sufficient petition. The petitioner must state that the charging document allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; the petitioner was

10

convicted of first or second degree murder; and the petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189, as effective on January 1, 2019. Subdivision (b)(1)(A) of section 1170.95 states where and how the petition must be filed and specifies its required content, including a declaration by petitioner that he or she "is eligible for relief under this section, based on all the requirements of subdivision (a)."

If the petition meets the requirements of section 1170.95, subdivisions (a) and (b), the trial court proceeds to subdivision (c) to assess whether a prima facie showing for relief has been made. In *Lewis*, *supra*, 11 Cal.5th 952, our Supreme Court held that if a defendant files a facially sufficient petition and requests the appointment of counsel, the court must appoint counsel and entertain further briefing. (*Id.* at p. 957.) Only after the appointment of counsel and the opportunity for briefing may the court consider the record of conviction to determine whether petitioner made a prima facie showing that he or she is entitled to relief. (*Id.* at pp. 969-970.)

The record of conviction relates to the trial court's inquiry, distinguishing petitions with potential merit from those clearly meritless. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) In making its preliminary assessment regarding petitioner's allegations, the court does not engage in fact finding and must take petitioner's allegations as true. (*Ibid.*) However, if the record of conviction, including the court's documents, refute the allegations in the petition, the court may make a credibility determination adverse to petitioner. (*Ibid.*)

Here, Wallace's petition for resentencing met the requirements for facial sufficiency and he requested the

11

appointment of counsel. The trial court thus erred in summarily denying his petition without first appointing counsel and accepting briefing. (*Lewis*, *supra*, 11 Cal.5th at pp. 969-970.) The court in *Lewis* nevertheless concluded that deprivation of a petitioner's right to counsel in this context is state law error only, tested for prejudice under the standard established in *People v. Watson* (1956) 46 Cal.2d 818.) Moreover, any error in summarily denying a section 1170.95 petition is harmless unless the petitioner can show """it is reasonably probable that if [he or she] had been afforded assistance of counsel his [or her] petition would not have been summarily denied without an evidentiary hearing."""" (*Lewis*, at p. 974.)

We conclude that the trial court's error in failing to appoint counsel and provide an opportunity for briefing before considering the record of conviction and summarily denying the petition is harmless. Contrary to Wallace's claim, the record of conviction unequivocally establishes that he was convicted of murder as a direct aider and abettor. As we noted in our opinion affirming Wallace's convictions on direct appeal, the jury instructions indicated "[Wallace] could be found guilty of first degree murder only if [he] intended to kill Madera and acted with premeditation. The jury thus convicted [him] under direct aiding and abetting principles . . . ." (*People v. Castaneda, supra,* B249571.) We also recognized that in finding true the financial gain special circumstance allegation, the jury necessarily found that Wallace acted with the requisite intent to kill. (§ 190.2, subd. (a)(1).)

Wallace contends that notwithstanding this unequivocal evidence that he was convicted as a direct aider and abettor who acted with an intent to kill, his petition for resentencing was

12

erroneously denied because he presented a declaration from Monroy alleging among other things that Wallace did not order him, Castaneda, or Jaime to kill Madera.  We are not persuaded because "section 1170.95 does not allow relitigation of factual questions that were settled by a prior jury . . . ."  (*People v. Secrease* (2021) 63 Cal.App.5th 231, 247, review granted June 30, 2021, S68862.)

## DISPOSITION

The order denying Wallace's section 1170.95 petition is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

13

John F. McGregor, Judge
Superior Court County of Santa Barbara

_____

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Christopher G. Sanchez, Deputy Attorney General, for Plaintiff and Respondent.